**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1173

SIERRA CLUB; WEST VIRGINIA RIVERS COALITION; INDIAN CREEK WATERSHED ASSOCIATION; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK,

Petitioners,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; MARK T. ESPER, in his official capacity as Secretary of the U.S. Army; TODD T. SEMONITE, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; PHILIP M. SECRIST, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Huntington District; MICHAEL E. HATTEN, in his official capacity as Chief, Regulatory Branch, U.S. Army Corps of Engineers, Huntington District,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

No. 18-1757

SIERRA CLUB; WEST VIRGINIA RIVERS COALITION; INDIAN CREEK WATERSHED ASSOCIATION; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK,

Petitioners,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; MARK T. ESPER, in his official capacity as Secretary of the U.S. Army; TODD T. SEMONITE, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; PHILIP M. SECRIST, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Huntington District; MICHAEL E. HATTEN, in his official capacity as Chief, Regulatory Branch, U.S. Army Corps of Engineers, Huntington District,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

On Petitions for Review of Actions by the U.S. Army Corps of Engineers.
(LRH-2015-592-GBR)

Argued: September 28, 2018                    Decided: November 27, 2018

Before GREGORY, Chief Judge, WYNN and THACKER, Circuit Judges.

Vacated by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

**ARGUED:** Derek O. Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. John David Gunter II, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. George Peter Sibley, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Intervenor. **ON BRIEF:** Evan D. Johns, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Petitioners. Jeffrey H. Wood, Acting Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, Emily A. Polachek, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Kevin S. Elliker, Richmond, Virginia, Deidre G. Duncan, Brian R. Levey, HUNTON ANDREWS KURTH LLP, Washington, D.C.; Robert McLusky, Douglas J. Crouse, JACKSON KELLY PLLC, Charleston, West Virginia, for Intervenor.

WYNN, Circuit Judge:

The Sierra Club, West Virginia Rivers Coalition, Indian Creek Watershed Association, Appalachian Voices, and Chesapeake Climate Action Network ("Petitioners") ask this Court to set aside Respondent U.S. Army Corps of Engineers' (the "Corps") December 22, 2017, verification ("Verification") and July 3, 2018, reinstated verification ("Reinstatement") that construction of the Mountain Valley Pipeline (the "Pipeline") can proceed under the terms and conditions of Clean Water Act Nationwide Permit 12 ("NWP 12"), rather than an individual permit. For the reasons that follow, we hold that the Corps lacked statutory authority to substitute its own special condition "in lieu of" a different special condition imposed by West Virginia as part of its certification of NWP 12.

We further conclude that, absent completion of the notice-and-comment procedures required by the Clean Water Act, a state cannot waive a special condition previously imposed as part of its certification of a nationwide permit. Because West Virginia did not follow its federally mandated notice-and-comment procedures in waiving another special condition the state imposed as part of its certification of NWP 12, that condition remains a required—but, in this case, unsatisfied—condition of the nationwide permit. Accordingly, we vacate, in their entirety, the Corps' December 22, 2017, Verification and July 3, 2018, Reinstatement authorizing the Pipeline's compliance with NWP 12.

I.

A.

The 42-inch diameter natural gas Pipeline proposes to run 304 miles through parts of Virginia and West Virginia, crossing the Corps' Pittsburgh, Norfolk, and Huntington Districts. In the Corps' Huntington District, the Pipeline and related access roads propose to cross 591 federal water bodies, including four major rivers (the Elk, Gauley, Greenbrier, and Meadow), three of which are navigable-in-fact rivers regulated by Section 10 of the Rivers and Harbors Act of 1899 (the Elk, Gauley, and Greenbrier). 33 U.S.C. § 403. Following extensive administrative proceedings, Intervenor Mountain Valley Pipeline, LLC ("Mountain Valley") obtained a certificate from the Federal Energy Regulatory Commission ("FERC") to construct and operate the Pipeline. Because construction of the Pipeline will involve the discharge of fill material into federal waters, the Clean Water Act requires that Mountain Valley obtain clearance from the Corps before beginning construction. 33 U.S.C. § 1344(a).

The Corps has established, by regulation, two methods to obtain a permit to discharge fill material into federal waters. *See Crutchfield v. Cty. of Hanover, Va.*, 325 F.3d 211, 214 (4th Cir. 2003). First, the Corps "can issue individual permits on a case-by-case basis," through a "resource-intensive review" requiring "extensive site-specific research and documentation, promulgation of public notice, opportunity for public comment, consultation with other federal agencies, and a formal analysis justifying the ultimate decision to issue or refuse the permit." *Id.* (citing 33 C.F.R. §§ 320.4, 325.1–325.3). Alternatively, "interested parties can try to fit their proposed activity within the

4

scope of an existing general permit," in this case NWP 12, "which acts as a standing authorization for developers to undertake an entire category of activities deemed to create only minimal environmental impact." *Id.* (citing 33 U.S.C. § 1344(e); 33 C.F.R. §§ 320.1(c), 330.1(b)–(c)). Potential permittees "must satisfy *all* terms and conditions of an NWP for a valid authorization to occur." 33 C.F.R. § 330.4(a) (emphasis added). Mountain Valley elected to pursue the general permit approach to obtain the Corps' clearance to discharge fill as part of Pipeline construction.

NWP 12, reissued most recently in 2017, 82 Fed. Reg. 1860 (Jan. 6, 2017), authorizes the discharge of dredged or fill material into federal waters attributable to "the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States." J.A. 40. NWP 12 includes several General Conditions designed to ensure that activities falling under NWP 12 minimally impact water quality, the aquatic environment and adjacent land, and water bodies managed by the Corps. *See, e.g.*, J.A. 45–46 (establishing conditions related to "adverse effects from impoundments," "soil erosion and sediment controls," and "removal of temporary fills."). General Condition 7 provides that, "No activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization." J.A. 46.

As with any other federal Clean Water Act permit, an applicant for a Section 1344(a) permit, like Mountain Valley, "shall provide the [Corps] a certification from the State in which the discharge originates or will originate," unless the state waives, either explicitly or by inaction, its right to independently certify the project. 33 U.S.C. §

5

1341(a)(1); *see also* 33 C.F.R. § 325.2(b)(1)(ii).  Section 1344(a)(1)'s state certification requirement also applies to "general" permits, like NWP 12.  33 C.F.R. § 330.4(c)(1).  When, as is the case with NWP 12, a state's certification of the general permit imposes additional "special conditions," the Corps must "make these special conditions regional conditions of the NWP for activities which may result in a discharge into waters of the United States in that state, unless [the Corps] determines that such conditions do not comply with the provisions of 33 C.F.R. § 325.4." *Id.* § 330.4(c)(2).

Pursuant to its authority under 33 U.S.C. § 1341(a)(1), West Virginia imposed, after providing public notice and receiving public comment, several additional "Special Conditions" as part of its certification of NWP 12.  Relevant to this case are Special Conditions A and C.  Special Condition A, in relevant part, provides that:

> Individual State Water Quality Certification is required for
>
> i.     Pipelines equal to, or greater than 36 inches in diameter;
> ii.    Pipelines crossing a Section 10 river (unless the bore is greater than 100 feet below the stream bed on the Ohio River mainstem, or greater than 50 feet below the stream bed on the Ohio River mainstem, or greater than 50 feet below the stream bed on all other Section 10 waters);

J.A. 43.  And Special Condition C provides that:

> Individual stream crossings must be completed in a continuous, progressive manner and within 72 hours during seasonal normal or below normal stream flow conditions. Crossings on the Ohio River, Kanawha River, New River, Monongahela River, and the Little Kanawha River, below the confluence with Hughes Rivers, are exempt from the 72-hour requirements. All stream activities shall be completed as rapidly as possible.

J.A. 43–44.  Accordingly, under Special Conditions A and C, NWP 12 in West Virginia requires certain pipelines to obtain an individual Section 401 certification (Special

Condition A) and limit construction of stream crossings to a 72-hour window, except for certain rivers not at issue in the instant case (Special Condition C). NWP 12 also requires the submission of a pre-construction notification to the Corps if any of seven criteria are met. Given the nature and scope of the Pipeline project, it satisfies several of these conditions. On February 25, 2016, Mountain Valley submitted an NWP 12 pre-construction notification for the Pipeline's 591 water crossings in the Huntington District.

B.

To comply with Special Condition A, Mountain Valley applied to the West Virginia Department of Environmental Protection (the "State Department") for an individual water quality certification. On March 23, 2017, the State Department issued a conditional grant of the certification, subject to certain special conditions and the standard 401 conditions. Petitioner Sierra Club timely petitioned this Court for review of the Department's individual certification. *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, No. 17-1714, ECF No. 3 (4th Cir. June 9, 2017). The State Department then sought voluntary remand with vacatur of its verification with this Court, contending that "the information used to issue the Section 401 Certification needs to be further evaluated and possibly enhanced" and that it "needs to reconsider its antidegradation analysis in the Section 401 Certification." *Id.*, ECF No. 42 (4th Cir. Sept. 13, 2017). On October 17, 2017, we granted the motion, vacated the Pipeline's individual water quality certification, and remanded to the State Department pursuant to 15 U.S.C. § 717r(d)(3). *Id.*, ECF No. 45 (4th Cir. Oct. 17, 2017). On remand, the State Department purported to waive its requirement that Mountain Valley obtain an Individual 401 Water Quality Certification.

7

Accordingly, Mountain Valley does not have an individual state water quality certification under Section 401 of the Clean Water Act.

On December 22, 2017, the Corps issued the Verification concluding that the Pipeline project meets the criteria of NWP 12, provided Mountain Valley "compl[ies] with all terms and conditions of the enclosed material and the enclosed special conditions." J.A. 1–2. The Verification recognized that Mountain Valley's expected construction timeframe of these crossings would "take a total of 4-6 weeks to complete, 1-3 weeks for each side of the crossings." J.A. 86. Based on consultation with FERC, Mountain Valley plans to use a "dry open cut" method to construct the Pipeline through four major, Corps-managed rivers (the Elk, Gauley, Greenbrier, and Meadow), which requires installing cofferdams directing water away from a riverbed construction area to minimize sedimentation and erosion. This "dry" open-cut method takes longer than "wet" open-cut construction, which involves constructing a pipeline while water continues to flow over the riverbed.

On May 22, 2018, pursuant to 15 U.S.C. § 717r(d)(1), Petitioner Sierra Club moved this Court to stay the Verification on grounds that contrary to the 72-hour limit set forth in Special Condition C, Mountain Valley expected to take four-to-six weeks to construct river crossings for the Pipeline through the Elk, Gauley, Greenbrier, and Meadow Rivers. ECF No. 40. On that same date, the Corps suspended the verification—purportedly as to the four rivers only—in order to "evaluat[e] the extent of [Mountain Valley's] compliance" with Special Condition C. J.A. 254. On June 21, 2018, this Court stayed the entire Verification. ECF No. 58.

8

On May 30, 2018, the Corps sent a letter to the State Department requesting the State Department's "views on whether the use of the dry-cut construction method is protective of water quality at the four crossings . . . ?" J.A. 256. The Corps further asked if the State "Department believe[s] that requiring the use of the method is more stringent for protecting water quality than the time requirement in Special Condition C?" *Id.* The next day, the State Department sent a letter to the Corps stating that it "believes the use of the 'dry' cut construction method . . . is more protective of water quality at each of the crossings" and "provides more stringent water quality protections than the time requirement in Special Condition C." J.A. 258. The State Department did not notify or solicit feedback from the public in any manner before responding to the Corps' letter.

On July 3, 2018, the Corps sent the Reinstatement to Mountain Valley "reinstat[ing] with modifications" its prior Verification of the Pipeline project's compliance with NWP 12. J.A. 229–30. Citing 33 C.F.R. § 330.5(d)(1)—which provides that the District Engineer has discretionary authority to modify a "case specific activity's authorization under an NWP"—the Corps imposed several additional "special conditions" in the Reinstatement. In particular, Special Condition 6 provides that:

> Construction of each river crossing (Greenbrier River, Gauley River, Elk River and Meadow River) will [be] conducted using the "dry" open-cut methodology (water-filled cofferdam approach) to minimize adverse effects to water quality, the aquatic environment, and overall environmental impacts. This Special Condition shall apply in lieu of Special Condition C of the West Virginia Department of Environmental Protection's (WVDEP) Section 401 Water Quality Certification (WQC) issued for Nationwide Permit 12 in West Virginia.

9

J.A. 232. The Reinstatement further noted that, in its Final Environmental Impact Statement for the Pipeline project, FERC concluded that "the proposed 'dry' method is preferred [to the 'wet' method] and thus found this method to be 'acceptable.'" J.A. 229. And the Reinstatement emphasized that the State Department also determined that the use of the "dry" cut construction "is more protective of water quality at each of the crossings of the Gauley, Greenbrier, Elk, and Meadow Rivers" as such techniques "generally provide better control of environmental sedimentation and more protection to the aquatic environment" than "wet" cuts, though "dry" crossings take longer to complete. J.A. 228.

Petitioners again timely filed a petition with this Court challenging the Corps' Reinstatement, and on July 6, 2018, Petitioners and Respondents filed a joint motion to consolidate that petition with Petitioners' earlier challenge to the Verification. Petitioners raise four issues: (1) whether the Corps exceeded its authority in the Reinstatement to impose Special Condition 6 "in lieu of" NWP 12's Special Condition C; (2) whether the Huntington Verification is inconsistent with Special Condition A; (3) whether the Verification lacked sufficient analysis of General Condition 7, and therefore fails arbitrary and capricious review;[1] and (4) whether complete vacatur or remand without vacatur is an appropriate remedy.

---

[1] Because we find that the Verification and Reinstatement exceeded the Corps' statutory authority, we need not—and thus do not—address whether the Corps acted arbitrarily and capriciously in its determination that Mountain Valley complied with General Condition 7. To the extent that Mountain Valley again seeks to fit the Pipeline project within the scope of NWP 12, the Corps, in the first instance, can more fulsomely address the Pipeline's compliance with General Condition 7 if it believes doing so would be necessary or beneficial.

Petitioners' challenges to the Verification and the Reinstatement are governed by the standards for reviewing administrative actions set forth in the Administrative Procedure Act ("APA"). Under the APA, we may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

We first address Petitioners' claim that the Corps exceeded its statutory and regulatory authority by imposing Special Condition 6 "in lieu of" NWP 12's Special Condition C. Petitioners assert that the verification was "not . . . in accordance with law," 5 U.S.C. § 706(2)(A), because (1) the Corps was without authority under the Clean Water Act to reject or replace a condition imposed as part of West Virginia's certification of NWP 12 and (2) even if the Corps had such statutory authority, imposing Special Condition 6 "in lieu of" Special Condition C conflicted with the Corps' regulations implementing the Clean Water Act.

A.

1.

We turn first to the statutory claim. Petitioners challenge Special Condition 6 on grounds that the Corps lacks authority under the Clean Water Act to "reject Section 401 certification conditions or remove them from a federal permit." Pet'rs' Br. at 30. When a challenger asserts that an agency action conflicts with the language of a statute, we generally apply the two-step analytical framework set forth in *Chevron U.S.A., Inc. v Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). A court first "looks to the 'plain

11

meaning' of the statute to determine if the regulation responds to it." *King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014), *aff'd*, 135 S. Ct. 2480 (2015) (quoting *Chevron,* 467 U.S. at 842–43). "If it does, that is the end of the inquiry and the regulation stands." *Id.* If the statute is ambiguous, courts then "move[] to *Chevron*'s second step and defer[] to the agency's interpretation so long as it is based on a permissible construction of the statute." *Id.*

But as the Supreme Court held in *United States v. Mead Corp.*, 533 U.S. 218 (2001), when an agency does not act with "the force of law," the agency action is not entitled to *Chevron* deference. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018) (quoting *Mead*, 533 U.S. at 226–27). Rather, in such circumstances, we afford the agency "modest" *Skidmore* deference, to the extent the agency's reasoning "give[s] it power to persuade," or, in the absence of such reasoning, no deference at all. *Sierra Club*, 899 F.3d at 288. An agency interpretation carries the "force of law" when "first, Congress has 'delegated authority to the agency generally to make rules' and, second, the 'agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Id*. at 286 (quoting *Mead*, 533 U.S. at 226–27).

When an agency's interpretation "derives from notice-and-comment rulemaking," it will "almost inevitably receive *Chevron* deference." *Knox Creek Coal Corp. v. Sec'y of Labor, Mine Safety & Health Admin.*, 811 F.3d 148, 159 (4th Cir. 2016) (citation omitted). However, "where an agency has interpreted a statute without aid or constraint from APA rulemaking procedures," we must look for "'other circumstances'. . . where there are 'indicia of a legislative-type determination.'" *Id*. (citations omitted). Agency

12

decisions with "procedural hallmarks of legislative decision-making" must include, "[a]t minimum . . . future application to claim rulemaking power." *Sierra Club*, 899 F.3d at 287. Other indicia of a legislative-type determination include the agency's consideration of "conflicting policies . . . [and] adversarial viewpoints" and its use of "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of law." *Id*. at 287–88.

The Corps' July 3, 2018, Reinstatement to Mountain Valley authorizing Special Condition 6 "in lieu of" Special Condition C necessarily rests on the Corps' determination that it has the statutory authority to substitute, on a case-specific basis, its own conditions for those conditions imposed by states as part of their certification of an NWP. Yet this determination, which the Corps nowhere expressly addresses in the Reinstatement, neither results from notice-and-comment rulemaking nor bears any of the "procedural hallmarks of a legislative-type determination." *Id*. at 288. This legal determination, upon which the Reinstatement relies, has no precedential value.

Indeed, the imposition of Special Condition 6 is highly specific to the four river crossings across the Greenbrier, Gauley, Elk, and Meadow Rivers, and makes no mention of the Condition even applying to all future crossings across those rivers. *See also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) ("The Forest Service was not acting with the force of law in this case because it was granting permits, not acting in a way that would have precedential value for subsequent parties."). Nor does the Reinstatement indicate any "adversarial or deliberative process where opposing views were presented or considered" with respect to whether the Corps has the statutory

13

authority to substitute its own conditions in place of state-imposed conditions. *Sierra Club*, 899 F.3d at 288. Instead, the Corps issued the Reinstatement after making a one-off, independent, and case-specific determination that Mountain Valley's "proposed discharge of dredged and/or fill material" at the four river crossings meets the criteria for NWP 12, provided Mountain Valley comply with all terms and conditions of the permit. J.A. 229. Further, were *Chevron* even to apply, the Corps would receive no deference because the Clean Water Act, as described further below, is not ambiguous as to whether Special Condition C applies to NWP 12.

Because the Corps' interpretation of the Clean Water Act with respect to Special Condition 6 does not merit *Chevron* review, we next consider whether it is entitled to *Skidmore* deference. *Skidmore* deference is appropriate depending upon "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

Here, however, the Reinstatement is completely devoid of any statutory analysis— Special Condition 6 does not even reference the Clean Water Act. In fact, the only explicit reference to the Act in the entire Reinstatement states the following: "Section 404 of the Clean Water Act . . . requires a Department of Army permit be obtained prior to discharging dredged and/or fill material into waters of the United States, including wetlands." J.A. 228. There is no effort made to explain or justify how the statutory text affords the Corps the authority to issue one special condition "in lieu of" a state-imposed condition, as it did in replacing Special Condition C with Special Condition 6. *See*

14

*Sierra Club*, 899 F.3d at 288 ("[B]ecause NPS makes no effort to specifically apply § 460a-8 to natural gas pipelines or to evaluate contrary arguments, its interpretation wholly lacks explanatory and persuasive power.").

Accordingly, the Corps' Reinstatement warrants neither *Chevron* nor *Skidmore* deference. So, we review de novo the Corps' construction of its authority under the Clean Water Act to replace a state-imposed condition on a nationwide permit.

2.

In interpreting a statute, the "cardinal rule . . . is that the intent of [Congress] is to be given effect." *NLRB v. Wheeling Elec. CO.*, 444 F.2d 783, 787 (4th Cir. 1971). To ascertain congressional intent, we first "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). When considering the plain meaning of the statutory language, we also "must consider the context in which the statutory words are used because . . . we read statutes as a whole." *Ayres v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006) (citation omitted). If the statute is unambiguous, "our inquiry into Congress' intent is at an end, for if the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." *William v. Gonzales,* 499 F.3d 329, 333 (4th Cir. 2007) (internal quotation marks omitted). We also look to a statute's legislative history as further evidence of congressional intent. *Elm Grove Coal Co. v. Director, O.W.C.P.*, 480 F.3d 278, 293 (4th Cir. 2007). Accordingly, we start with the plain language of Section 1341(d) of the Clean Water Act but also consider its structure, purpose, and legislative history as additional evidence of congressional intent. *See*

15

*Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 471 (4th Cir. 2011) ("[S]tatutory construction . . . is a holistic endeavor.") (citing *United Sav. Ass'n. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)).

The plain language of Section 1341(d) of the Clean Water Act provides that any state certification "*shall* become a condition on any Federal license or permit." 33 U.S.C. § 1341(d) (emphasis added). This language leaves no room for interpretation. "Shall" is an unambiguously mandatory term, meaning, as courts have uniformly held, that state conditions *must* be conditions of the NWP—i.e., the Corps "may not *alter or reject* conditions imposed by the states." *U.S. Dep't of Interior v. F.E.R.C.*, 952 F.2d 538, 548 (D.C. Cir. 1992) (emphasis added); *see also Am. Rivers, Inc. v. F.E.R.C.*, 129 F.3d 99, 107 (2d Cir. 1997) (recognizing the "unequivocal" and "mandatory" language of Section 1341(d)). Every Circuit to address this provision has concluded that "a federal licensing agency lacks authority to reject [state Section 401 certification] conditions in a federal permit." *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1218 (9th Cir. 2008) (collecting cases); *see also F.E.R.C.*, 952 F.2d at 548 ("FERC may not *alter or reject* conditions imposed by the states through section 401 certificates." (emphasis added)). The plain language of the statute does not authorize the Corps to replace a state condition with a meaningfully different alternative condition, even if the Corps determines that the alternative condition is more protective of water quality.

The Corps concedes as much, acknowledging that it is an "established principle that an agency may not ignore a state condition and issue a permit with less stringent conditions." Gov't Br. at 21. Nevertheless, the Corps contends that its imposition of

16

Special Condition 6 "in lieu of" Special Condition C does not run afoul of that rule because the Corps does not claim discretion to ignore, reject, or replace Special Condition C. Instead, the Corps claims that it "has incorporated Special Condition C into NWP 12 in West Virginia, and Special Condition C continues to define the scope of NWP 12 authorizations in other cases." *Id.* at 21–22. Put differently, the Corps argues that Section 1341(d) authorizes the Corps to reject or alter conditions in a state certification of a Nationwide Permit *on a project-specific basis* if the condition meets the "floor for water quality protection" provided for in Special Condition C. *Id.*

The Corps' argument fails for two reasons. First, contrary to the Corps' position, the Reinstatement's explicit language applying Special Condition 6 "in lieu of" Special Condition C indicates that it is replacing Special Condition C. *See Dorzback v. Collison*, 195 F.2d 69, 72 (3d Cir. 1952) ("The phrase 'in lieu of' means 'instead of.'"). By substituting Special Condition 6 for Special Condition C, the Corps effectively and unlawfully "reject[ed]" a state-imposed condition. *F.E.R.C.*, 952 F.2d at 548. Second, the Corps' argument presupposes that the Clean Water Act's requirement regarding the mandatory incorporation of state conditions differs in the context of nationwide permits versus individual permits. Yet no statutory language supports this claim. On the contrary, neither Section 1341(d), nor any other provision in Section 1341, draws any distinction between nationwide and individual permits.

The Corps also claimed at oral argument that its position is supported by the Ninth Circuit's decision in *Snoqualmie*. Oral Argument at 39:47–40:40. In that case, the Washington State Department of Ecology issued a water quality certification specifying

17

minimum water flows over the Snoqualmie Falls, a sacred site for the Snoqualmie Tribe. *Snoqualmie*, 545 F.3d at 1211. As required by Section 401 of the Clean Water Act, FERC made compliance with the state's water quality certification a condition of its license. *Id.* Subsequently, FERC revised its license to require higher minimum flows at all times during May and June. *Id*. at 1212. The Ninth Circuit considered whether a federal agency like FERC could "impose additional, more stringent requirements above the standards contained in a state's [certification]." *Id*. at 1218. The Court held that an agency "may require *additional* license conditions that *do not conflict with or weaken* the protections" in the state certification. *Id.* at 1219 (emphasis added). But unlike the case here, "FERC's increase in minimum water flows is not contrary to, nor did it weaken, the minimum flow requirements" in the state's water quality certification. *Id*. at 1219. Put differently, FERC's revised condition in *Snoqualmie* still allowed for compliance with the state condition.

*Snoqualmie* meaningfully differs from the instant case because there is no dispute that Special Condition 6 and Special Condition C cannot simultaneously be satisfied. In fact, Special Condition 6 expressly contemplates that the "dry" method will take longer than the 72-hour limit prescribed by Special Condition C, and therefore Mountain Valley cannot satisfy Special Condition C while using the "dry" method. Only if Special Condition 6 had required a river-crossing time of *within* 72 hours could both conditions be satisfied. Indeed, the Reinstatement specifically states that the "dry" open-cut method, which cannot be achieved in 72 hours, would "otherwise be inconsistent with Special Condition C." J.A. 245. Because the Clean Water Act mandates that Special Condition

18

C be followed under NWP 12, we conclude that the Corps' issuance of the Reinstatement authorizing Special Condition 6 "in lieu of" Special Condition C exceeded its statutory authority and therefore must be vacated under 5 U.S.C. § 706(2)(C).

Congress's express purpose in enacting the Clean Water Act—and Section 1341, in particular—as well as that provision's legislative history are in accord with Section 1341(d)'s plain and unambiguous language. If adopted, the Corps' broad interpretation of its own discretionary authority would significantly upset Congress's carefully prescribed allocation of authority between federal and state agencies in the Clean Water Act. The Act explicitly recognizes "[i]t is the policy of the Congress to recognize, preserve, and protect *the primary responsibilities and rights of States* to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." 33 U.S.C. § 1251(b) (emphasis added). And the Act further states that, unless expressly provided, "nothing . . . shall preclude or deny" the right of states to "control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State," and agencies "shall comply" with these state requirements. 33 U.S.C. § 1344(t).

Legislative history further emphasizes the central role Congress intended for the States to play under the regulatory scheme laid out in the Act. *See* S. Rep. 92–414, at 4 (1971) ("The States have first responsibility for enforcement of their standards."); *see also* S. Rep. 92–414, at 69 (1971) ("In addition, [Section 401] makes clear that any water quality requirements established under State law, more stringent than those requirements established under this Act, also *shall* through certification become conditions on any

19

Federal license or permit.") (emphasis added); Jim Rossi & Thomas Hutton, *Federal Preemption and Clean Energy Floors,* 91 N.C. L. Rev. 1283, 1294–95 (2013) (observing that the Act's authorization of state-determined water quality standards is "widely considered a leading example of cooperative federalism").

Of particular relevance, the Senate Report addressing the version of Section 401 ultimately enacted by Congress also specifically states that "[t]he purpose of the certification mechanism provided in [Section 1341] is to assure that Federal licensing or *permitting agencies* cannot override State water quality requirements." S. Rep. 92–414, at 69 (1971) (emphasis added). Yet "overriding" state water quality requirements is precisely what the Corps seeks to do here. By substituting Special Condition 6 for Special Condition C, the Corps has essentially directed a federal agency override of West Virginia's state-imposed condition as part of NWP 12. Such agency action is explicitly barred by the Act.

The State certifications under Section 401 are "essential in the scheme to preserve state authority to address the broad range of pollution," *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006), and states remain, "under the Clean Water Act, the prime bulwark in the effort to abate water pollution." *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991); *see also Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 390 (4th Cir. 2018) ("Under the CWA, states have the primary role in promulgating water quality standards.") (citation omitted). Were the Corps' construction of the Clean Water Act accepted, the Corps could, in future, replace *any* state condition with an alternative condition, so long as it deemed the alternative condition more environmentally

20

protective. We decline to sanction this level of discretionary authority that would allow the Corps, with few guardrails, to replace state-imposed conditions.

Indeed, such authority would materially alter the Clean Water Act's balance of authority between federal agencies and the states. For example, another special condition imposed by West Virginia as part of its certification of NWP 12—Special Condition L—provides that "[n]o structure authorized by this permit shall impede or prevent fish movement upstream or downstream." J.A. 44. Under the Corps' theory, it would be permissible for the Corps to replace that structure prohibition with, for example, a "dry" open cut provision so long as the Corps determined the "dry" provision was, overall, more protective of water quality than the structure provision, even though those conditions appear to target substantively different environmental protection goals. Further, the state may have legitimate reasons for preferring the structure condition to the dry-cut condition, even if the dry-cut condition is more environmentally protective. For example, the state may be more concerned with preserving places for fish to spawn than preventing erosion and sedimentation.[2] Put simply, the state may prefer protecting the environment in one way to protecting it in another way. But in enacting Section 1341(a)(1), Congress did not intend to allow federal agencies to "override" such state policy determinations. S. Rep. 92–414, at 69 (1971). That the Corps seeks to override state policy decisions without providing public notice or receiving public comment—

---

[2] We recognize that West Virginia has issued a draft for public comment to modify its Special Conditions for Section 401 NWPs. However, until that process concludes and a modification is issued, we are bound by the state's current certification of NWP 12.

21

procedures required by Congress in Sections 1341 and 1344—renders the Corps' claim of unconstrained authority to set aside state certification conditions on a case-by-case basis all the more problematic. *See infra* Part III.

Absent any further limiting principles, the Corps' interpretation would radically empower it to unilaterally set aside state certification conditions as well as undermine the system of cooperative federalism upon which the Clean Water Act is premised. Further, the plain language of the Clean Water Act does not authorize the Corps to replace a state condition with a meaningfully different alternative condition, even if the Corps reasonably determines that the alternative condition is more protective of water quality. Accordingly, we vacate the July 3, 2018, Reinstatement as exceeding the Corps' statutory authority. 5 U.S.C. § 706(2)(C).

B.

The Corps' own Clean Water Act implementing regulations reinforce our conclusion that Section 1341(d)'s plain and unambiguous language bars the Corps from replacing Special Condition C with Special Condition 6. The Reinstatement primarily cites to 33 C.F.R. §§ 330.1(d) and 330.1(e)(2) as the relevant authority for the Corps' replacement of Special Condition C, although the Reinstatement does not explain in any depth how the Act authorizes such an interpretation or application of those provisions. Instead, the Reinstatement merely states that the Corps "used its discretion" under these two provisions and "determined a modification of Special Condition C is necessary to 'further condition or restrict the applicability' of NWP 12." J.A. 245.

Section 330.1(d) provides:

22

District and division engineers have been delegated a discretionary authority to suspend, modify, or revoke authorizations under an NWP. This discretionary authority may be used by district and division engineers only to further condition or restrict the applicability of an NWP for cases where they have concerns for the aquatic environment under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public interest.

Likewise, Section 330.1(e)(2) provides that the Corps district engineer, in responding to a precertification notice

may add activity-specific conditions to ensure that the activity complies with the terms and conditions of the NWP and that the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal.

Although not mentioned in the Reinstatement, the Corps also relies in its briefing on 33 C.F.R. § 330.4(e), which provides that the Corps "reserves the right (i.e., discretion) to modify . . . NWP authorizations." 33 C.F.R. § 330.4(e). Modification "means the imposition of additional or revised terms or conditions on the authorization." *Id*. The Corps argues that Special Condition 6 constitutes a "further condition or restrict[ion]" on NWP 12 and therefore was within its discretionary authority.

But a close reading of those regulations and the Corps' other regulations implementing Section 1341, as well as the plain language of that statute, do not support the discretionary authority the Corps claims to substitute Special Condition 6 for Special Condition C. The Corps' regulations state that "a prospective permittee must satisfy *all terms and conditions* of an NWP for a valid authorization to occur." 33 C.F.R. § 330.4(a) (emphasis added). This regulation therefore further supports that we must follow the specific mandates of Section 1341(d), which govern the state certification of NWPs. Under that "mandatory" and "unequivocal" language, the Act rejects agencies' ability to

23

unilaterally "review and reject state-imposed conditions." *Am. Rivers*, 129 F.3d at 107; *see also supra* Part II.A.

The other regulations relied upon by the Corps similarly require that a project satisfy all terms and conditions of an NWP *before* obtaining "authorization" to proceed under the NWP. For instance, Section 330.2(c) provides that "[a]uthorization means that specific activities that qualify for an NWP may proceed, *provided that the terms and conditions of the NWP are met*. After determining that the activity complies with *all applicable terms and conditions*, the prospective permittee may assume an authorization under an NWP." 33 C.F.R. § 330.2(c) (emphases added). Put differently, "[a]n activity is authorized under an NWP *only if* that activity and the permittee satisfy *all of the NWP's terms and conditions*." 33 C.F.R. § 330.1(c) (emphasis added).

Thus, a precondition for "authorization" of the Pipeline project is satisfaction of "*all* of the NWP's terms and conditions," necessarily including state-imposed conditions like Special Condition C under Section 1341(a). 33 C.F.R. § 330.1(c) (emphasis added). The Corps' regulations specifically refer to the Corps' ability to modify "authorizations under an NWP" (Section 330.1(d)) and "NWP authorizations" (Section 330.4(e)). So, only a successful authorization activates the discretionary authority in Sections 330.1(d) and 330.4(e)(1) upon which the Reinstatement purports to rely. In other words, full compliance with each and every condition in the underlying NWP, including Special Condition C, is a precondition for the Corps to exercise its discretionary authority to modify the conditions.

Notably, the "definitions" section of the regulations defines the "discretionary authority" conferred on the Corps as the authority of the relevant Corps official "to modify an NWP authorization by *adding conditions*, to suspend an NWP authorization, or to revoke an NWP authorization and thus require individual permit authorization." 33 C.F.R. § 330.2(g) (emphasis added). That the regulations define the Corps' discretionary authority as the power to "add[] conditions" further establishes that the Corps can exercise its discretionary authority only after all "terms and conditions" of an NWP have been satisfied because it presupposes that the NWP's other conditions are already met. The plain language of the regulations does not permit the Corps to *replace* conditions in the NWP, as it did by substituting Special Condition 6 "in lieu of" Special Condition C. Instead, the Corps' discretionary authority allows it to supplement the conditions set forth in an NWP with additional conditions, but that discretionary authority is triggered only upon a successful NWP authorization—i.e., satisfaction of all terms and conditions of the NWP. Further, that authority is limited to providing *additional* conditions, above and beyond those found in the NWP, not replacing them wholesale, as the Corps did here.

The Corps argues that such a reading of its regulations would render Section 330.4(e)'s language superfluous. In particular, the Corps focuses on Section 330.4(e)'s language that "[m]odification means the imposition of additional *or revised* terms or conditions on the authorization." 33 C.F.R. § 330.4(e) (emphasis added). The Corps argues that under this reading, the phrase "or revised" would be meaningless, because then "all modifications to the NWP authorization would be 'additional.'" Gov't Br. at 25.

25

However, as above, we must consider this provision in conjunction with the Clean Water Act and the language of the Corps' other regulations. *See Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 324 (4th Cir. 2012) (emphasizing the "cardinal rule that statutory [or regulatory] language must be read in context because a phrase gathers meaning from the words around it") (citation omitted) (brackets in original). Given the regulations' repeated indication that an "authorization" requires full compliance with the terms and conditions of the underlying NWP, Section 330.4(e) is most naturally read to mean that only *after* a project has received such an "authorization"—potentially an authorization including "additional" "activity-specific" conditions—can the Corps modify the existing "authorization" by adding further conditions or "revis[ing]" any activity-specific conditions previously imposed. Under this reading, the Corps could still "revise" existing conditions under an obtained authorization when any of the criteria mentioned in 33 C.F.R. § 330.5 are met, including when there are "changes in circumstances relating to the authorized activity since the NWP itself was issued." 33 C.F.R. § 330.5(d)(1). Therefore, the Corps still retains substantial discretionary authority, but a project must first meet the underlying conditions of the NWP, and therefore be authorized, to trigger that authority.

The Corps further argues that this reading fails to meaningfully distinguish a "verification" from an "authorization" because "authorization" exists "even when no verification is required," and the Corps' "authority to impose 'additional *or revised* terms or conditions' applies to the 'authorization,' not to the broader Nationwide Permit or the narrower verification." Gov't Br. at 23. We agree that verifications and authorizations

26

meaningfully differ, and that a project can be "authorized" even if it is not "verified" because authorization inheres, even without verification, if a project complies with the terms and conditions of the NWP. However, that distinction does not advance the Corps' argument.

Here, the Pipeline project never satisfied all terms and conditions of NWP 12 because, without dispute, it cannot satisfy the time limit set forth in Special Condition C. The Pipeline project never obtained "authorization" under NWP 12, and therefore there is no "authorization" for the Corps to "modify" through "revis[ion]." To agree with the Corps would allow the Corps' discretionary authority to permit noncompliance with an NWP condition. Such a finding would reject the plain language of the Clean Water Act, which bars the Corps from rejecting, altering, or overriding a state-imposed condition. *See supra* Part II.A.

We accord no deference to an agency's "improper interpretation of a decidedly unambiguous regulation." *Sierra Club v. United States Forest Serv.*, 897 F.3d 582, 602–03 (4th Cir. 2018). Therefore, Special Condition 6 cannot constitute a "further condition or restrict[ion]" under 33 C.F.R. § 330.1(d) because the plain language of the regulations, governed by the Clean Water Act, presupposes that all the conditions in the NWP have been met. Given the unambiguous language of the Act that state conditions mandatorily become conditions on the NWP, "[t]o defer to the [Corps] . . . would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000).

Because the Reinstatement replaced Special Condition C with Special Condition 6, rather than merely supplementing or revising the Conditions in the underlying NWP, the Corps exceeded its statutory authority. *See supra* Part II.A. That the Reinstatement conflicts with the Corps' regulations provides further support for our decision to vacate the Reinstatement.

## III.

We next address Petitioners' argument that the Verification was "not . . . in accordance with law," 5 U.S.C. § 706(2)(A), because Special Condition A provides that individual state water quality certifications are required for pipelines equal to or greater than 36 inches in diameter crossing Section 10 rivers. Because the Department waived its requirement that Mountain Valley obtain an individual 401 state water quality certification, the parties agree that Mountain Valley does not possess an individual certification, even though it meets the triggering criteria for Special Condition A.

As a threshold matter, this Court must determine what legal standard it will apply—an issue neither party squarely addresses. The Corps appears to believe the deferential standard of review set forth in *Chevron* applies, arguing at several points that the Corps' interpretation of Special Condition A is "reasonable," and that Petitioners' plain language interpretation "is permissible, [but] not compelled." Gov't Br. at 35, 38, 41; *see also id.* at 37 (stating that the Corps' alternative interpretation of Special Condition A is "available"). However, as stated above, *Chevron* applies only if an agency action "carries the force of law." *Sierra Club*, 899 F.3d at 286.

28

As with the Reinstatement, there is no evidence that the Corps intended to act with the force of law in rendering its determination in the Verification that a state can waive a condition it imposed in certifying an NWP—here, Special Condition A—without providing public notice and soliciting public comment. The Corps' Verification simply states that "On 1 November 2017, [the Department] waived the requirement for Mountain Valley to obtain an [individualized permit]." J.A. 94. The Verification includes no explanation of the Corps' rationale for why it concluded that the state's waiver of its condition without notice-and-comment was valid, let alone any indication that it viewed that determination as binding in future cases. *Sierra Club*, 899 F. 3d at 288. Nor was this determination the product of an adversarial process in which opposing views were presented. *Id.* at 288. And the more extensive reasoning offered in the Corps' briefing constitutes "mere[] litigation positions that do not reflect an exercise of delegated legislative authority." *Id.* at 286. Accordingly, under *Mead*, the Verification's legal conclusion that it could rely on the State Department's purported waiver of its state-specific condition absent notice-and-comment is not entitled to *Chevron* deference. Similarly, as with the Reinstatement, the Verification is not entitled to *Skidmore* deference, as the Corps provided no reasoning at all as to its legal conclusion regarding the state's ability to waive Special Condition A without notice-and-comment under the text of the Clean Water Act. *See Skidmore*, 323 U.S. at 140.

The Corps argues that it lawfully relied on the State Department's waiver letter to conclude Special Condition A was satisfied. Its argument primarily rests on the claim that the "certification" in Special Condition A is reasonably understood as having the

29

same meaning as "certification" in Section 1341(a)(1). Examining several certification requirements under the Act, the Corps and Mountain Valley maintain that Section 1341(a)(1)'s use of the term "certification" "implicitly encompasses the possibility of waiver" and contend that the use of "certification" in Special Condition A should be read similarly. Gov't Br. at 37. Under this reading, a "state's waiver may substitute for an individual water quality certification" under Special Condition A. *Id*. at 39.

However, the Corps' argument ignores one critical aspect of the statutory language. Although Section 1341(a)(1) expressly contemplates that the state may "waive" its right to separately certify a federal permit, it also uses *both* the terms "certification" and "waive[]," thus undermining the Corps' argument that the Corps validly interpreted Special Condition A to be satisfied by the Department's waiver. Ultimately, under Section 1341(a)(1), "certification" does not encompass "waiver," as the certification requirements do not even apply when a state has waived its certification authority. Further support for this reading comes from the Corps' regulations themselves. Section 330.4(c)(1) states that "State 401 water quality certification pursuant to section 401 of the [CWA], *or waiver thereof*, is required prior to the issuance or reissuance of NWPs." 33 C.F.R. § 330.4(c)(1) (emphasis added). Accepting the Corps' reading of "certification" would therefore likely render its own regulation redundant.

At any rate, even assuming West Virginia could waive Special Condition A, the waiver was invalid because it did not result from the notice-and-comment process contemplated by Section 1341(a)(1). That section provides that each state "shall establish procedures for public notice in the case of all applications for certification by it

30

and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. § 1341(a)(1). Put differently, *federal* law requires that the states establish notice-and-comment procedures for reviewing applications for certification of nationwide or individual permits.

Here, West Virginia followed its Section 1341(a)(1)-mandated notice-and-comment procedures in certifying NWP 12, and therefore in imposing Special Condition A. But the State Department did not provide a notice-and-comment opportunity in waiving Special Condition A for the Pipeline project. Allowing West Virginia to revoke, on a *case-specific* basis, conditions imposed in its certification of a *nationwide* permit would impermissibly allow the state to circumvent Section 1341(a)(1)'s explicit requirement that state permit certifications satisfy notice requirements.

Our decision in *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999), guides our ruling today. In that case, the Environmental Protection Agency ("EPA") brought an enforcement action under the Clean Water Act against Smithfield, a pork processing and packing company. Smithfield's two swine slaughtering and processing plants discharged pollutants into federal waters, for which it obtained authorization by a permit from both the EPA and the relevant state regulator. *Id.* at 520. The state regulator subsequently modified Smithfield's permit, after allowing public review and comment, to apply a more restrictive provision further limiting the maximum discharge amount of a particular pollutant. Afterward, the state regulator issued several orders, without engaging in the notice-and-comment process, purportedly delaying Smithfield's obligation to comply with the new standard, and Smithfield failed to comply

31

with the new standards. *Id.* at 522–23. Due to state inaction, the EPA brought an enforcement action against Smithfield for violating its state permit. *Id.* at 523. In defense, Smithfield sought to rely on the state regulator's subsequent orders as modifications of the terms of the permit. *Id.* at 523–24. Smithfield additionally argued that the district court erred in finding that the EPA's suit was not barred by Section 309(g)(6)(A)(ii) of the Clean Water Act, which provides in part that "any violation of the CWA 'which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection' shall not be the subject of a federal civil enforcement action." *Smithfield*, 191 F.3d at 524–25.

Two aspects of the district court's reasoning and judgment—and this Court's adoption of that reasoning and judgment—are particularly relevant to the present case. First, the district court in *Smithfield* found that the state regulator's subsequent orders did not change the terms of the permit because they did not follow the "specific, mandatory procedures for modification" of the permit laid out in 40 C.F.R. § 122.62. 965 F. Supp. at 787. That regulation implements Sections 318, 402, and 405 of the Clean Water Act. 40 C.F.R. § 122.1(a)(1), (3). Like Section 401 of the Act, which is codified at Section 1341(a)(1), Section 402 of the Act, 33 U.S.C. § 1342(b)(3), explicitly provides for the "opportunity for public hearing" before the administrator issues the relevant pollutant discharge permit. Further, also like Section 1341(a)(1), Section 1342(b)(3) provides that the public "receive notice of each application for a permit."

Admittedly, *Smithfield* involved a different form of permit issued by the EPA and a distinct portion of the Act. However, Section 1342(b), just like Section 1341(a), lays

32

out mandatory procedures for notice-and-comment before the issuance of a proposed state permit. Therefore, under our reasoning in *Smithfield*, the Corps' Verification cannot recognize the state's waiver of Special Condition A absent the state following the "specific, mandatory procedures for modification" laid out in Section 1341(a). 965 F. Supp. at 787.

In *Smithfield*, we also agreed with the district court's ruling that Virginia's enforcement scheme was not sufficiently comparable to Section 309(g) of the Act to trigger the statutory provision barring the EPA's suit. *Id*. at 530 n.4. Central to the district court's analysis was that for a state law to be comparable to Section 309(g)—and therefore for the EPA's suit to be barred—the state law must contain "public notice and participation rights that are similar to Section 309(g)." 965 F. Supp. at 793. We adopted the district court's reasoning and judgment that Virginia's law was not sufficiently comparable to Section 309(g). *Smithfield*, 191 F.3d at 530 n.4. As the district court concluded, the state's enforcement scheme lacked Section 309(g)'s "public notice and participation safeguards . . . to ensure that interested citizens have an opportunity to contest administrative actions." *Smithfield*, 965 F. Supp. at 793; *see also* 33 U.S.C. § 1319(g)(4)(A) ("Before issuing an order assessing a civil penalty under this subsection the Administrator or Secretary, as the case may be, shall provide public notice of and reasonable opportunity to comment on the proposed issuance of such order.").

Again, this aspect of *Smithfield* addressed a different provision of the Act. But our reasoning nonetheless signals the critical importance of notice-and-comment requirements throughout the Clean Water Act. Smithfield could not argue that an EPA

suit was barred precisely because the state enforcement scheme *lacked* the notice-and-comment requirements required by the Act. In the instant case, this reasoning carries even more weight, as any state modifications to its certification of NWP 12 are directly subject to Section 1341(a)(1)'s requirement that states establish notice-and-comment procedures.

In sum, Section 1341(a)(1) of the Clean Water Act specifically contemplates and requires a notice-and-comment process for case-specific modifications of conditions imposed as part of a state's Section 401 certification of a nationwide permit. To hold otherwise would constitute a back-door mechanism for a state to circumvent Congress's intended notice-and-comment process: the state could issue certification conditions after engaging in the required notice-and-comment process but then refuse to apply those conditions in each case. Accordingly, if West Virginia desires to waive Special Condition A, it must do so through the proper notice-and-comment procedures laid out in Section 1341(a)(1). Because the Corps' Verification and Reinstatement ignored this requirement, and impermissibly found that Mountain Valley complied with all terms and conditions of NWP 12, we vacate them both in their entirety.

IV.

Finally, the Corps and Mountain Valley argue that this Court need not vacate the Verification and Reinstatement in their entirety but should instead remand the case to the Corps to further consider whether verification is appropriate. In support of this position, the Corps and Mountain Valley rely on the D.C. Circuit's decision in *Allied-Signal, Inc.*

34

*v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. 1993), concluding that a court may decline to vacate an insufficiently supported agency decision on equitable grounds.

This Court has never formally embraced the *Allied-Signal* remand-without-vacatur approach. Nevertheless, even if we were to follow *Allied-Signal*, that decision would not support the Corps' and Mountain Valley's argument. *Allied-Signal* holds that in deciding whether to exercise its discretion to remand, rather than vacate, an unlawful agency action, a court should consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and whether "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 150–51. Therefore, *Allied-Signal*'s use of the remedy of remand without vacatur principally is relevant in matters where agencies have "inadequately supported rule[s]." *Id*. at 150. That is not the case here. Instead, we find that the Verification and Reinstatement's conclusions as to Special Conditions A and C were legally deficient, as they exceeded the Corps' statutory authority. The Supreme Court has recognized that Section 706(2)(A) "requires federal courts to set aside federal agency action" that is "not in accordance with law." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).

Given that Special Condition C cannot be satisfied by the "dry" method, an individual permit will likely be necessary. Therefore, there is not a "serious possibility" that the agency will be able to "substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. Accordingly, we vacate the Verification and Reinstatement in their entirety.

*VACATED*

35