**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-2039

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; WEST VIRGINIA RIVERS COALITION; WEST VIRGINIA HIGHLANDS CONSERVANCY; INDIAN CREEK WATERSHED ASSOCIATION; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK,

          Petitioners,

      v.

UNITED STATES ARMY CORPS OF ENGINEERS; RYAN D. MCCARTHY, in his official capacity as Secretary of the U.S. Army; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; MAJOR GENERAL ROBERT F. WHITTLE, JR., in his official capacity as Division Commander of the U.S. Army Corps of Engineers, Great Lakes and Ohio River Division; COLONEL JASON A. EVERS, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Huntington District; THERESA SPAGNA, in her official capacity as Chief, Regulatory North Branch, U.S. Army Corps of Engineers, Huntington District,

          Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

          Intervenor.

No. 20-2042

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; WILD VIRGINIA; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK,

Petitioners,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; RYAN D. MCCARTHY, in his official capacity as Secretary of the U.S. Army; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; COLONEL PATRICK V. KINSMAN, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Norfolk District; WILLIAM T. WALKER, in his official capacity as Chief, Regulatory Branch, U.S. Army Corps of Engineers, Norfolk District,

Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

Intervenor.

On Petitions for Review of Actions by the U.S. Army Corps of Engineers. (LRH-2015-592-GBR; NAO-2015-08998)

Argued: November 9, 2020                    Decided: December 1, 2020

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

Motions for stay granted by published per curiam opinion.

Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. Kevin William McArdle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. George Peter Sibley, III, HUNTON ANDREW KURTH, LLP, Richmond, Virginia, for Intervenor.

2

PER CURIAM:

The Sierra Club, Center for Biological Diversity, West Virginia Rivers Coalition, West Virginia Highlands Conservancy, Indian Creek Watershed Association, Appalachian Voices, and Chesapeake Climate Action Network (collectively, "Petitioners") filed the instant motions to stay certain agency actions of the United States Army Corps of Engineers ("Army Corps"). Specifically, Petitioners challenge decisions of two different Army Corps districts: the Huntington, West Virginia District ("Huntington District") and the Norfolk, Virginia District ("Norfolk District"). Mountain Valley Pipeline, LLC ("MVP") asked both districts to verify that, pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1344, MVP's proposed discharge of dredged and/or fill material into waters of the United States in furtherance of construction of a natural gas pipeline ("Pipeline") in those districts could be governed by the Army Corps' 2017 nationwide permit ("NWP"), referred to as NWP 12.

By operating under the more general NWP 12, MVP would not have to undertake the more arduous and time-consuming individual CWA permitting process tailored to specific projects. Typically, potential permittees who wish to take advantage of an NWP for a potential project typically must submit pre-construction notifications to the Army Corps for a "verification" that the project would comply with the NWP. *Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1860, 1861, 1986 (Jan. 6, 2017).

On September 25, 2020, the Huntington District issued a verification, determining that the Pipeline project met the criteria for operation under the NWP 12, excusing the project from the individual permitting process (the "Verification"). On the same day, the

3

Norfolk District did the same, issuing a reinstatement of its prior verification allowing MVP to use NWP 12 in that district (the "Reinstatement"). Petitioners then filed petitions for agency review of the Verification and Reinstatement pursuant to the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(d)(1), and filed the instant motions to stay.

Applying a familiar four-part test, we conclude Petitioners are likely to succeed on the merits of their petitions for review, and other equitable factors weigh in favor of granting the motions for stay. As explained more fully below, the Verification was likely issued in contravention of applicable law because the Army Corps impermissibly incorporated into NWP 12 a modified permit condition from the West Virginia Department of Environmental Protection ("WVDEP"). And because the Verification was likely issued in contravention of law, the Reinstatement (which necessarily depends on the validity of the Verification) is likely defective as well. Therefore, we grant Petitioners' motions for a stay of the Huntington District's Verification and the Norfolk District's Reinstatement until such time as we may consider the petitions for review on their merits. We do not, however, believe Petitioners are likely to succeed on the merits of their challenges to the Army Corps' 2017 issuance of NWP 12 itself because we likely lack jurisdiction to entertain such challenges.

I.

This is not our first look at an Army Corps verification allowing the Pipeline to use NWP 12. In 2018, we vacated a prior version of the Huntington District's Verification,

4

finding it to be in contravention of applicable law. *See Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 639 (4th Cir. 2018).[1]

The Pipeline, which is 42 inches in diameter, "proposes to run 304 miles through parts of Virginia and West Virginia, crossing the [Army] Corps' Pittsburgh, Norfolk, and Huntington Districts." *Sierra Club*, 909 F.3d at 639. Because construction of the Pipeline will involve the discharge of fill material into federal waters, the CWA requires MVP to obtain approval from the Army Corps before beginning construction. *See* 33 U.S.C. § 1344(a).

> [T]he Corps can issue individual permits on a case-by-case basis, through a resource-intensive review requiring extensive site-specific research and documentation, promulgation of public notice, opportunity for public comment, consultation with other federal agencies, and a formal analysis justifying the ultimate decision to issue or refuse the permit. Alternatively, interested parties can try to fit their proposed activity within the scope of an existing general permit, in this case NWP 12, which acts as a standing authorization for developers to undertake an entire category of activities deemed to create only minimal environmental impact. Potential permittees must satisfy *all* terms and conditions of an NWP for a valid authorization to occur.

*Sierra Club*, 909 F.3d at 640 (citations and internal quotation marks omitted) (emphasis in original). In order to utilize NWP 12, MVP is also required to "'provide the [Army Corps] a certification from the State in which the discharge originates or will originate,' unless the

---

[1] Of note, in that opinion we suggested "an individual permit will likely be necessary" for the Pipeline project. *Sierra Club*, 909 F.3d at 655. MVP maintains, however, that it is entitled to use NWP 12 and has not attempted to seek an individual permit.

state waives, either explicitly or by inaction, its right to independently certify the project." *Id.* (quoting 33 U.S.C. § 1341(a)(1)); *see also* 33 C.F.R. §§ 325.2(b)(1)(ii), § 330.4(c)(1). When "a state's certification of the general permit imposes additional 'special conditions,'" the Army Corps "must 'make these special conditions regional conditions of the NWP for activities which may result in a discharge into waters of the United States in that state,'" except in certain circumstances not present here. *Id.* (quoting 33 C.F.R. § 330.4(c)(2)).

## II.

In determining whether to grant a stay of an agency action, this court considers (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits"; (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted). In considering the likelihood of the merits inquiry, we are mindful that, pursuant to the Administrative Procedures Act ("APA"), we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Sierra Club*, 909 F.3d at 643.

## III.

### Likelihood of Success on the Merits

In these motions, Petitioners make two distinct challenges to the Verification. First, they claim the Verification is unlawful because the Army Corps violated the Endangered Species Act ("ESA") when it reissued NWP 12 in January 2017; thus, ostensibly because

6

the Verification relies on NWP 12, it must necessarily be arbitrary, capricious, and not in accordance with law. Second, they claim the Verification impermissibly relies on and incorporates modifications to NWP 12 that were made in contravention of applicable law. As explained below, we conclude that Petitioners are not likely to succeed on the merits of the former argument because we likely lack jurisdiction to entertain Petitioners' challenge on this point. However, we hold that Petitioners are likely to succeed on the merits of the latter argument.

## A.

### The Endangered Species Act and NWP 12

Petitioners' first argument is that, because the Army Corps failed to engage in programmatic consultation with the United States Fish and Wildlife Service ("FWS") before reissuing NWP 12 in January 2017, that reissuance violated the ESA. As a result, Petitioners assert that NWP 12 is invalid, and because the Army Corps relied on NWP 12 in issuing the Verification, the Verification too is fatally infected.

Petitioners have not made a "strong showing" that they are likely to succeed on the merits of this claim because this court likely lacks jurisdiction to entertain it. *Nken*, 556 U.S. at 426 (internal quotation marks omitted). "Because district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *NMS Healthcare of Hagerstown, LLC v. United States Dep't of Health & Human Servs.*, 619 F. App'x 225, 226 (4th Cir. 2015) (quoting *Nat'l Mining Ass'n v. Sec'y of Labor*, 763 F.3d 627, 632 (6th Cir. 2014)). "Initial review of agency decisions occurs at the appellate

7

level only when a direct-review statute *specifically* gives the court of appeals subject-matter jurisdiction to directly review agency action." *Id.* (quoting *Nat'l Mining Ass'n*, 763 F.3d at 632) (emphasis supplied). The burden of establishing subject matter jurisdiction rests upon the party asserting it. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

In *Sierra Club*, our jurisdiction to review prior Army Corps verifications derived from the NGA, 15 U.S.C. § 717r(d)(1), which provides:

> The United States Court of Appeals for the circuit in which a [natural gas] facility . . . is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the [Federal Energy Regulatory] Commission) . . . to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law[.]

This provision allows for a narrow exception to the general rule that district courts possess jurisdiction to review agency actions in the first instance. Petitioners contend we possess jurisdiction over their ESA argument based on this provision.

We disagree. In form, Petitioners purport to seek review only of the Verification and Reinstatement themselves, not NWP 12. *See* Pet. for Review, *Sierra Club v. United States Army Corps of Eng'rs*, No. 20–2039 (4th Cir. filed Sept. 28, 2020), ECF. No. 3; Pet. for Review, *Sierra Club v. United States Army Corps of Eng'rs*, No. 20–2042 (4th Cir. filed Sept. 28, 2020), ECF No. 3. But in substance, Petitioners are actually seeking collateral review of a separate decision -- the Army Corps Secretary's findings and conclusions in its reissuance of NWP 12, not the Huntington and Norfolk Divisions'

8

*reliance* on NWP 12 in issuing the Verification and Reinstatement. In so doing, Petitioners are attempting an end run around the narrow jurisdictional provisions that govern review of permits for natural gas pipeline projects. Crucially, Petitioners do not contend that they cannot pursue a challenge to NWP 12 in the district court. To the contrary, at least two of the Petitioners here -- the Sierra Club and the Center for Biological Diversity -- already brought a similar ESA challenge in the District of Montana. *See N. Plains Res. Council v. United States Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 2020 WL 3638125 (D. Mont. May 11, 2020).

Throughout the briefing on the motions to stay, Petitioners steadfastly contend the Army Corps violated the ESA in its reissuance of NWP 12 by failing to engage in formal consultation and failing to "consider the cumulative impacts of NWP-authorized activities on protected species or their critical habitat." *See* Pet'rs' Mot. Stay 7;[2] *see also id.* at 9 (arguing the Army Corps "violated the ESA in issuing NWP 12"); *id.* at 9–10 (challenging the Army Corps' finding that NWP 12 would have "no effect" on certain species pursuant to the ESA); *id.* at 12 (noting the "problem with relying on project-specific consultation" in an ESA no-effect determination).

These challenges are not contemplated in the NGA review provision set forth above. Section 717r(d)(1) is most logically read to allow review of permits issued pursuant to the construction, expansion, or operation of a natural gas facility (i.e., a pipeline) in the circuit

---

[2] Citations to the Motion to Stay, responses, and replies refer to the briefing in Case No. 20–2039. We recognize that many of the same arguments were repeated in the briefing in Case No. 20–2042.

court of appeals where that facility will be operated or constructed. But NWP 12 does not authorize any specific NGA project. Rather, it "governs a broad range of activities that can be undertaken anywhere in the country under a wide variety of circumstances." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1058 (10th Cir. 2015).

Petitioners rely on the idea that "an exclusive judicial review provision applies to all issues inhering in the controversy." Pet'rs' Reply Br. 3 (quoting *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 265 (4th Cir. 2011) (internal quotation marks omitted)). But *Dow* in inapplicable here. In *Dow*, this court decided that a Biological Opinion ("BiOp") challenged by the petitioners was a "final agency action for which there is no other adequate remedy in a court" pursuant to the APA, and thus, properly reviewable in the district court. 637 F.3d at 265 (quoting 5 U.S.C. § 704). First, as noted, Petitioners do not contend their specific ESA challenges to NWP 12 are unreviewable elsewhere. Second, in determining whether an issue "inher[es] in the controversy," the type of challenge matters:

> [W]hen a court of appeals reviews the EPA's *reliance on a BiOp* issued by [FWS], the court's review would not be the same as if the district court were to review the BiOp itself directly under the APA. When a court of appeals reviews *the EPA's reliance* on a BiOp, it would determine only whether the EPA's reliance was arbitrary and capricious. *But only by direct judicial review by the district court under the APA could the BiOp's findings and conclusions themselves be challenged.*

*Id.* at 266–67 (last emphasis supplied).

We cannot decide whether the Huntington District impermissibly relied on NWP 12 in issuing the Verification without first reaching Petitioners' challenges to the findings and

conclusions *underlying* NWP 12. And according to *Dow*, this type of challenge is properly reviewable in the district court -- not before us. Therefore, Petitioners are not likely to succeed on the merits of the ESA challenge to NWP 12 because we likely do not possess jurisdiction to address such a challenge.[3]

B.

The Huntington Verification

Petitioners fare better, however, on the likelihood of success of their second challenge to the Verification and Reinstatement.

1.

Pursuant to the CWA, West Virginia imposed several special conditions as part of its Section 401[4] certification of NWP 12 in 2017. Only one is relevant to these motions:

---

[3] We also note that Petitioners have not demonstrated that they will suffer irreparable harm if we decline to address their ESA claim in this venue. In fact, as mentioned, some Petitioners have already brought an ESA challenge to NWP 12 in the District of Montana, and they were successful there, although the Supreme Court limited the scope of the district court's decision to pertain only to the Keystone XL Pipeline. *See N. Plains*, 2020 WL 3638125, at *14 ("NWP 12 is vacated as it relates to the construction of new oil and gas pipelines pending completion of the consultation process and compliance with all environmental statutes and regulations."), *stay issued*, 2020 WL 3637662 (U.S. July 6, 2020) ("The district court's May 11, 2020 order granting partial vacatur and an injunction is stayed, except as it applies to the Keystone XL pipeline[.]"). Interestingly, only after this stay order did Petitioners attempt to bring their ESA claim in this court.

[4] A state water quality certification is also referred to as a "Section 401" certification, in reference to Section 401 of the CWA. In relevant part, Section 401 provides:

> Any applicant for a Federal license or permit to conduct any
> activity including, but not limited to, the construction or

11

Special Condition A.  Originally, and at the time of this court's prior *Sierra Club* decision,

Special Condition A provided the following:

> Individual State Water Quality Certification is required for
>
> i.  Pipelines equal to, or greater than 36 inches in diameter; [or]
>
> ii.  Pipelines crossing a Section 10 river [subject to certain exceptions]. . . .

*Sierra Club*, 909 F.3d at 640–41.[5]  To comply with this condition, MVP applied to the

WVDEP for an individual water quality certification.  On March 23, 2017, the WVDEP

issued a conditional certification.  However, the WVDEP later vacated that certification,

---

> operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . . If the State . . . fails or refuses to act on a request for [water quality] certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.  No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence.  No license or permit shall be granted if certification has been denied by the State[.]

33 U.S.C. § 1341(a)(1).

 [5] A "Section 10 river" is a "navigable-in-fact river[] regulated by Section 10 of the Rivers and Harbors Act of 1899."  *Sierra Club*, 909 F.3d at 639 (citing 33 U.S.C. § 403). The Rivers and Harbors Act was "intended to prevent obstructions in the Nation's waterways."  *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967).  The Pipeline proposes to run through three Section 10 rivers: the Elk, Gauley, and Greenbrier. *See Sierra Club*, 909 F.3d at 639.  It is undisputed that the Pipeline is greater than 36 inches in diameter.

explaining "the information used to issue the Section 401 Certification needs to be further evaluated and possibly enhanced." *Sierra Club*, 909 F.3d at 641 (internal quotation marks omitted). On October 17, 2017, we vacated the Pipeline's Section 401 certification, and remanded to the WVDEP pursuant to 15 U.S.C. § 717r(d)(3). *See id.* On remand, the WVDEP "purported to waive its requirement that [MVP] obtain an Individual 401 Water Quality Certification." *Id*.

In *Sierra Club*, however, we concluded that the WVDEP was required to engage in proper notice and comment procedures before it could waive the Section 401 requirement set forth in Special Condition A. *See* 909 F.3d at 651–55. Upon our vacatur of the prior Huntington District verification for this reason, the WVDEP -- rather than waive the Section 401 certification -- decided to modify Special Condition A. After a notice and comment procedure (which Petitioners do not challenge), on April 24, 2019, the WVDEP revised Special Condition A as follows:

> **The Secretary of the West Virginia Department of Environmental Protection, in the Secretary's sole discretion, reserves the right to require A~~a~~n** individual water quality certification ~~is required~~ for any of the following facilities or impacts:
>
> i.      Pipelines equal to or greater than 36 inches in diameter; [or]
>
> ii.     Pipelines crossing a Section 10 river [subject to certain exceptions][.]

Pet'rs' Mot. Stay, Ex. 8 at 10–11 (modifications supplied). Therefore, according to this WVDEP amendment, an individual water quality certification is only required for pipelines over 36 inches in diameter (like the Pipeline) if the WVDEP Secretary believes it should

13

be. And here, the Secretary issued a general Section 401 certification without an individual water quality certification. *See id.*, Ex. 8 at 1–2; *see also id.*, Ex. 7 at 26 ("On 27 February 2020, the WVDEP provided a letter in accordance with Special Condition A of the general [water quality certification] for NWP 12 stating that the WVDEP will not require an individual [water quality certification] for the MVP.").

The WVDEP then requested the Army Corps to "incorporate this modification into its NWPs for West Virginia, in accordance with 40 C.F.R. § 121.2(b)." Pet'rs' Mot. Stay, Ex. 8 at 1. On January 15, 2020, the Division Engineer for the Corps' Great Lakes and Ohio River Division purported to grant the WVDEP's request to modify Special Condition A and "incorporated [it] as [a] regional condition[]" to NWP 12. *Id.*, Ex. 12 at 1. Thereafter, on September 25, 2020, the Huntington District issued the Verification, memorializing the modification of Special Condition A into NWP 12. *Id.*, Ex. 7 at 26 (noting the WVDEP's modified condition).[6]

---

[6] The Army Corps and MVP contend that we lack jurisdiction over this challenge as well. We disagree. The precise Special Condition A challenges to the Verification and Reinstatement fit neatly within the NGA's jurisdictional provision, 15 U.S.C. § 717r(d)(1). The Verification and Reinstatement are both actions of federal agencies; they approve stream crossings in Virginia and West Virginia, as required by the CWA; and they are each decisions approving permits in furtherance of construction of a natural gas pipeline facility. In an attempt to eschew the NGA's judicial review provisions, the Army Corps maintains "[t]he Corps' acceptance of West Virginia's revised conditions is not, as Petitioners assume, equivalent to the Corps' substitution of its own condition for the State's condition, which was the issue in *Sierra Club*." Resp'ts' Resp. Br. 19 (emphasis omitted); *see also id.* at 16 (characterizing Petitioners' argument as a "challenge to the Corps' *acceptance* of West Virginia's revised Section 401 certification" (emphasis supplied)). But these characterizations are inaccurate. Petitioners seek review not merely of the Army Corps' "acceptance" of WVDEP's modified Special Condition A; rather, they contend the Army Corps' reliance on and incorporation of the modified condition into NWP 12 by way of the

14

2.

Petitioners contend that the issuance of the Verification with the WVDEP's modified Special Condition A was unlawful for two reasons. First, Petitioners assert that the Army Corps Division Engineer lacks the authority to modify NWP 12, yet it did so here by incorporating the revised Special Condition A into NWP 12. Second, Petitioners argue that even if the Division Engineer did possess such authority, it abused its discretion in allowing the modification because the modified Special Condition A is less stringent (and thus, less protective of West Virginia water crossings) than the original version of Special Condition A. We conclude that Petitioners have made a strong showing they are likely to succeed on the merits of the argument that the Division Engineer lacks authority to incorporate modified Special Condition A into NWP 12.

a.

A series of interweaving statutes and regulations inform our decision. First, "[a] prospective permittee must satisfy *all terms and conditions* of an NWP for a valid authorization to occur." 33 C.F.R. § 330.4(a) (emphasis supplied). Second, the CWA authorizes the Secretary of the Army, acting through the Army Corps' "Chief of Engineers," to issue, revoke, or modify NWPs. 33 U.S.C. § 1344(d)–(e). Third, a Section

Verification was improper under the CWA and its regulations. This is a similar challenge to the one we addressed in *Sierra Club*. *See* 909 F.3d at 651–53 (assuming jurisdiction over "Petitioners' argument that the Verification was not in accordance with law" because West Virginia could not waive Special Condition A without proper procedure, once that condition had been incorporated into NWP 12 (alterations and internal quotation marks omitted)).

401 certification -- or a waiver thereof -- is "required" from a state "prior to the issuance or reissuance of NWPs authorizing [discharge] activities." 33 C.F.R. § 330.4(c)(1). And if a state chooses to add a special condition to the use of an NWP within its borders, it may do so, and such special condition "shall become" a condition of the NWP. 33 U.S.C. § 1341(d).

b.

Turning to the facts of the case at hand in relation to this permitting scheme, pursuant to its authority under Section 401 of the CWA, the WVDEP held public notice and comment and adopted the initial version of Special Condition A to provide that all pipelines with a diameter of 36 inches or more or those crossing certain Section 10 rivers must have an individual water quality certification. This special condition automatically became part of NWP 12 in West Virginia in 2017. *See* 33 U.S.C. § 1341(d). Then, in ensuing litigation over the Pipeline, the WVDEP attempted to walk back this special condition, purporting to waive Section 401 certification altogether. *See Sierra Club*, 909 F.3d at 652–53. When this court concluded the WVDEP did not effectively waive Special Condition A pursuant to CWA statutes and regulations, the WVDEP modified Special Condition A such that the Secretary of the WVDEP can now decide on a case-by-case basis whether to require an individual water quality certification for pipelines over 36 inches in diameter and/or those crossing Section 10 rivers. The Verification incorporated the modified Special Condition A into the requirements for NWP 12.

16

c.

i.

Petitioners are likely to succeed on the merits of their challenge to the Army Corps' incorporation of the modified Special Condition A because neither the Army Corps nor MVP has provided regulatory or statutory authority for the actions the Army Corps undertook in this case. The CWA is clear that Special Condition A (in its original form) became part of NWP 12 in West Virginia, and we made clear in *Sierra Club* that the WVDEP has not effectively waived this requirement. *See* 909 F.3d at 653. The CWA is also clear that only a Chief Engineer can issue, modify, or revoke an NWP. And here, it is undisputed that the Chief Engineer did not do so. It is also undisputed that, at this time, the WVDEP has yet to issue an individual water quality certification for the Pipeline.

ii.

The Army Corps and MVP contend that in some circumstances, a division engineer may add regional conditions to an NWP. They rely on the following regulation:

> If, *prior to the issuance or reissuance of such NWPs*, a state issues a 401 water quality certification which includes special conditions the division engineer will make these special conditions regional conditions of the NWP for activities which may result in a discharge into waters of the United States in that state, unless he determines that such conditions do not comply with the provisions of 33 C.F.R. 325.4.

33 C.F.R. § 330.4(c)(2) (emphasis supplied). However, the Army Corps and MVP ignore an important distinction between the effect of a state's adoption of a special condition *before* the issuance of an NWP, as opposed to a state's attempt to modify or issue a special condition *subsequent* to the issuance of an NWP. In fact, MVP conveniently omits this

17

part of the regulation from its response brief. *See* Intervenor's Resp. Br. 16. By the plain language of this regulation, the division engineer will make special conditions issued prior to the NWP permitting process regional conditions of the NWP, but the regulation plainly does not allow a division engineer to do so where a state has modified a special condition after the issuance of NWP 12.

### iii.

Finally, we turn to regulations governing the modification of a state's special condition after the issuance of an NWP. After modifying Special Condition A, the WVDEP asked the Army Corps to "incorporate this modification into its NWPs for West Virginia, *in accordance with 40 C.F.R. § 121.2(b)*." Pet'rs' Mot. Stay, Ex. 8 at 1 (emphasis supplied); *see id.*, Ex. 7 at 26 ("[T]he WVDEP modified its general Section 401 [certification] for the 2017 NWPs in accordance with 40 CFR § 121.2(b)."). And the division engineer purported to grant WVDEP's request to modify Special Condition A. *See id.*, Ex. 12 at 1.

The regulation cited by the WVDEP, however, does not allow for the modification in this case. At the time the WVDEP modified Special Condition A, in April 2019, section 121.2(b) provided, "The certifying agency [i.e., the state] may modify the [Section 401] certification in such manner as may be agreed upon by the certifying agency, the licensing or permitting agency [i.e., the Corps], and the Regional Administrator." 40 C.F.R. § 121.2(b) (effective until Sept. 10, 2020). But on September 11, 2020, the Environmental Protection Agency ("EPA") amended this regulation to remove any mention of modification of conditions. Thus, now it merely states, "Certification is required for any

18

license or permit that authorizes an activity that may result in a discharge." *Id.* (effective Sept. 11, 2020).

> This change was the culmination of the EPA's solicitation of comments on
>
>> whether and to what extent States . . . should be able to modify a previously issued certification, either before or after the reasonable period of time expires, before or after the license or permit is issued, or to correct an aspect of a certification or its conditions if remanded or found unlawful by a federal or State court or administrative body.

*Clean Water Act Section 401 Certification Rule*, 85 Fed. Reg. 42210, 42279 (July 13, 2020). The agency determined, "[S]ection 401 does not provide authority for a certifying authority to unilaterally modify a certification, either through certification conditions that purport to authorize the certifying authority to reopen the certification in the future or through any other mechanism." *Id.* It continued, "[O]nce a certification is issued, the conditions therein are incorporated into . . . a federal license or permit[] for implementation and enforcement. Allowing certifications to be modified after issuance could create significant confusion and regulatory uncertainty within those federal license and permit programs." *Id.* Thus, the EPA concluded, "[S]ection 401 *does not provide certifying authorities with the authority to modify certifications after they are issued*." *Id.* at 42280 (emphasis supplied).

In rendering this decision, the EPA indicated that it was clarifying a longstanding principle, rather than breaking new ground. *See* 85 Fed. Reg. at 42236 ("This final rule modernizes and clarifies the EPA's regulations and will help States, Tribes, federal agencies, and project proponents know what is required and what to expect during a section

19

401 certification process, thereby reducing regulatory uncertainty."). It noted that "[a]s a general matter, administrative agencies possess the inherent authority to reconsider prior decisions"; however, "section 401 provides express statutory language . . . that displaces the general principle and thus *Congress has precluded the certifying authority from reconsidering or modifying a certification.*" 85 Fed. Reg. at 42280 (emphases supplied). This "express statutory language," upon which the EPA relies, includes CWA's provisions "specifying the time period in which a certifying authority must act on a certification request or waive its right to act," *see* 33 U.S.C. § 1341(a)(1), and "requiring certification conditions to be incorporated into a separate federal permit," *see id.* § 1341(d). *Id.*

This clarification weighs heavily in favor of Petitioners on the likelihood of success on their Special Condition A challenge. Indeed, the WVDEP and the Corps rely on this regulation for the state's authority to amend Special Condition A -- and, accordingly, the Corps to adopt it as part of NWP. *See, e.g.*, Resp'ts' Resp. Br., Ex. F at 7 ("Pursuant to 40 CFR § 121.2(b), the certifying agency has the authority to modify a [water quality certification].""); *see also id.* at 8 ("EPA regulations provide for modification of state certifications 'as agreed upon' by the state, the permitting agency, and EPA" (quoting 40 CFR 121.2(b)); *id.* at 11 ("Under 40 CFR 121.2(b), the state has authority to make subsequent modifications [to the Section 401 certificate].""). But by this clarification from the EPA, the WVDEP did not (and does not) possess such authority.[7]

---

[7] To be clear, for purposes of these motions, we do not pass on the legitimacy of this regulation, as no party has challenged the EPA's promulgation of it. Nor do we believe

20

For these reasons, we conclude the Verification was likely issued in contravention of applicable law because WVDEP likely did not possess the authority to modify Special Condition A in April of 2019, and the division engineer likely did not possess authority to rely on or incorporate this modification into NWP 12.

C.

The Norfolk Reinstatement

Whether Petitioners are likely to succeed on the merits of the Norfolk Reinstatement rises and falls on the legitimacy of the Huntington Verification. NWP 12 contains a note ("Note 2"), which states, "Utility line activities must comply with 33 C.F.R. 330.6(d)." *Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1860, 1986 (Jan. 6, 2017). In turn, 33 C.F.R. § 330.6(d) states, "[P]ortions of a larger project may proceed under the authority of the NWPs while the [division engineer] evaluates an individual permit application for other portions of the same project, but *only if the portions of the project qualifying for NWP authorization would have independent utility and are able to function or meet their purpose independent of the total project*." (emphasis supplied).

The Army Corps has explained that, under Note 2, "[i]f one or more crossings of waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R.

---

the change in regulation evinces anything but the EPA's clarification of how state modifications should have operated all along.

330.6(d)." 82 Fed. Reg. at 1888. It further stated that Note 2's purpose was "to ensure that utility lines with one or more crossings that do not qualify for NWP authorization are evaluated under the individual permit process." *Id.* Therefore, the Army Corps contemplated that if one pipeline crossing does not qualify for NWP, the entire pipeline would be subject to the individual permitting process. *See Sierra Club v. United States Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. Oct. 2, 2018) (per curiam) (order vacating prior Huntington verification, explaining that if any part of a project requires an individual permit, then "the NWP does not apply and all portions of the project must be evaluated as part of the individual permit process" (internal quotation marks omitted)).

Therefore, because Petitioners' challenge to the Huntington Verification is likely to succeed on the merits, its challenge to the Norfolk Reinstatement is likely to succeed on the merits as well.

IV.

Remaining Stay Factors

Finally, we conclude the balance of the stay factors -- whether Petitioners will be irreparably injured absent a stay; whether issuance of the stay will substantially injure the other parties interested in the proceeding; and where the public interest lies -- weighs in favor of granting the motions for stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). Absent a stay, MVP intends to begin crossing the streams and rivers at issue. MVP submits that it "has spent billions to complete the vast majority of project tasks, including the installation of pipe along nearly 260 miles" and delay until spring 2021 would cost MVP around $140 million in unrecoverable costs. Intervenor's Resp. Br. 23.

22

But "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And "[t]he dredging . . . that may occur while the Court decides the case cannot be undone and, if the end result is that the Corps should not have issued [the permit], irreparable harm will have occurred in the meantime." *Sierra Club v. United States Army Corps of Eng'rs*, 399 F. Supp. 2d 1335, 1348 (M.D. Fla. 2005), *vacated on other grounds*, 464 F. Supp. 2d 1171, 1228 (M.D. Fla. 2006). In addition, while the Army Corps and MVP both contend natural gas projects serve the public interest, the NGA yields to the CWA. 15 U.S.C. § 717b(d) (explaining "nothing in this chapter affects the rights of States under [the CWA]"). Therefore, the balance of the four stay factors weigh in favor of Petitioners.

V.

For these reasons, we grant Petitioners' motions to stay.

*20–2039 - MOTION GRANTED*
*20–2042 - MOTION GRANTED*

23